UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LAURA ANN ILSEMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:23-CV-00138-SPM |
| ST. CHARLES COUNTY, MISSOURI, and | ) | |
| | ) | |
| CURTIS SULLIVAN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment. ECF No. 32. The motion has been fully briefed, and the parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). ECF No. 10. For the following reasons, the motion will be granted.

## I.    FACTS[1]

On February 8, 2018, Detective Kevin Euton of the St. Charles City Police Department, with other officers, stopped a vehicle operated by Randall Jones in the parking lot of the Pinewood Place apartment complex and arrested Jones. Jones, who was Plaintiff Laura Ilsemann's fiancé, lived with Plaintiff in an apartment at 1014 Pinewood Place Drive. Jones told Euton that he (Jones) had a firearm inside the apartment. Euton knew Jones was a convicted felon. Ilsemann approached the scene of Jones's arrest. She spoke to an officer and asked him if he would let her know what was going on and whether it was regarding her fiancé. Defs.' Ex. B, ECF No. 34-2, Ilsemann Dep.,

---

[1] Except as otherwise specified, these facts are taken from Defendants' Statement of Undisputed Material Facts ("SUMF") (ECF No. 34) and Plaintiff's response thereto (ECF No. 35-1), with the facts presented in the light most favorable to Plaintiff as the non-movant.

– 1 –

19:23-20:2. The officer started asking her questions, but she said she did not know what was going

on and did not feel comfortable answering any questions not knowing what was taking place. *Id.*

at 20:18-21:3. The officer told her that she could go 'f---' herself, after which she was upset and

spoke loudly to him. *Id.* at 21:24-22:9; 23:2-12. Plaintiff walked over to a second officer, told him

what the first officer had said and that she was very upset about it, told him she was going into her

apartment, told him her apartment number, and asked if they could come talk to her and let her

know what was going on. *Id.* at 21:24-22:4, 23:24-24:3. He said they would send somebody over.

*Id.* at 25:6-8. One of the officers Plaintiff spoke to was Euton, who informed her that there was a

shotgun inside the residence and asked for her consent to search the apartment; she said no. Defs.'

Ex. D, ECF No. 34-4, Euton Dep., 13:7-18. Plaintiff left and went inside her apartment. Plaintiff's

apartment was on the first floor of the building, opened to an outside hallway, and was adjacent to

the traffic stop. Defs.' Ex. B, ECF No. 34-2, Ilsemann Dep., 12:1-10; Defs.' Ex. A, ECF No. 34-

1, 2023 Sullivan Dep., 27:22-25.[2]

Defendant Curtis Sullivan, of St. Charles County, and Brandon Milatovic, of the St. Peters

Police Department, arrived at the scene following Jones's arrest. Euton told Sullivan that Jones

was a convicted felon and that there was a firearm inside Jones's and Plaintiff's apartment. Euton

told Sullivan that Ilsemann had come to the scene of the traffic stop, was extremely agitated, was

irate, and was cursing and demanding to speak with Jones. Defs.' Ex. A, ECF No. 34-1, 2023

Sullivan Dep., 28:12-21. Euton intended to apply for a search warrant for Jones's and Ilsemann's

apartment.

---

[2] Neither party directed the Court to any facts addressing where Plaintiff's apartment was located
relative to the traffic stop. However, the Court finds such facts highly relevant to the issues
presented. In assessing a motion for summary judgment, "[t]he court need consider only the cited
materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Sullivan and Milatovic went to Plaintiff's apartment to seek consent to enter and to seek consent to secure the firearm. The officers knocked on Plaintiff's door, and a fourteen-year-old girl answered the door; the officers asked to speak to her mother, and the girl summoned Plaintiff. Pl.'s Ex. 3, ECF No. 35-1, 2019 Sullivan Dep., 15:3-16:6. Sullivan and Milatovic were outside Plaintiff's apartment and could not see the entirety of its interior. Sullivan could see the living room area and could see down the hallway, and he saw a second fourteen-year-old girl in the living room. Defs.' Ex. A, ECF No. 34-1, 2023 Sullivan Dep., 35:1-17. The two fourteen-year-olds were Plaintiff's daughter and Plaintiff's daughter's friend. Plaintiff stepped out into the breezeway and closed the door behind her. *Id.* at 16:7-13. When Plaintiff came to the door, things appeared to be calm. Defs.' Ex. E, ECF No. 34-5, 2023 Milatovic Dep., 13:17-21. Sullivan conversed with Ilsemann for more than 10 to 15 minutes, explaining why Jones had been arrested and that Jones had stated a firearm was inside the apartment. Defs.' Ex. A, ECF No. 34-1, 2023 Sullivan Dep., 31:21-32:24. Ilsemann told Sullivan a firearm was inside the apartment and that she knew Jones was not supposed to have a gun. Sullivan asked for consent to enter the apartment and secure the residence. After Sullivan asked to come in the house, Ilsemann became angry and upset, took an aggressive stance, and denied consent to enter her apartment.

Ilsemann tried to close the door, but Sullivan put his foot in the doorway to stop her from doing so. Sullivan testified that he was concerned for officer safety based on Plaintiff's demeanor and actions, the presence of a firearm, Plaintiff's demeanor and actions, the two fourteen-year-olds being in the apartment, and the potential execution of a search warrant. The officers did not know whether anyone other than Plaintiff and the two fourteen-year-olds was inside. However, both officers admitted they had no reason they could articulate to believe there was anyone else inside. Pl.'s Ex. 3, ECF No. 35-3, 2019 Sullivan Dep., 81:6-9; Pl.'s Ex. 4, ECF No. 35-4, 2019 Milatovic Dep., 19:24-20:9.

– 3 –

While Plaintiff tried to close the door with one hand, her other hand was resting on the door frame. Defs.' Ex. B, ECF No. 34-2, Ilsemann Dep., 35:6-7, 37:14-38:5.[3] Sullivan grabbed Plaintiff's wrist, pushed the door back open with his foot, and pulled her out of the door. *Id.* at 38:1-11. He yelled at her, told her to stop resisting, told her she was being detained, and placed her in handcuffs just outside her door. *Id.* at 38:12-19, 40:12-24. After Plaintiff was in custody, Milatovic went into the apartment and conducted a sweep that included only areas where a person could be; it lasted about five minutes. At some point, Plaintiff and at least one officer went back into her apartment, where Plaintiff (handcuffed) and officers waited in the apartment for the search warrant, which Plaintiff thought took about four hours. *Id.* at 43:3-20, 45:5-46:9. The search warrant, which authorized a search for "firearms and or other related materials" was eventually obtained. Defs.' Ex. N, ECF No. 34-14, at 4. During execution of the search warrant, police found two shotguns, a nine-millimeter handgun, ammunition, swords, and drug paraphernalia inside Plaintiff's apartment. Plaintiff was released at the scene once the search ended.

More than four months later, on June 25, 2018, Sullivan submitted a probable cause statement to the to the St. Charles County Prosecuting Attorney's Office in support of his application for four charges against Plaintiff: Conspiracy—Possession of Firearm Unlawful for Certain Persons; Assault on Law Enforcement Officer 4th Degree; Resisting Arrest; and Possession of Drug Paraphernalia. Defs.' Ex. F, ECF No. 34-6, at 5. The St. Charles County Prosecuting Attorney's Office charged Plaintiff with the four offenses identified in the probable cause statement, a judge found probable cause that a crime had been committed and issued a warrant for Plaintiff's arrest for the same four charges, and a grand jury indicted Plaintiff on the

---

[3] Sullivan testified that Plaintiff pushed Sullivan's left shoulder at this time, but Plaintiff's testimony suggests instead that one hand was closing the door and the other was resting on the door frame.

same four charges. Plaintiff was arrested in August 2018. Ex. B, ECF No. 34-2, Ilsemann Dep., 78:22-80:2. Plaintiff eventually entered an Alford plea to an amended charge of resisting or interfering with the stop or detention of Jones; the other charges against Plaintiff were dismissed as part of the plea agreement *Id.* at 86:21-87:24; Defs.' SUMF ¶ 44.

As of February 8, 2018, St. Charles County had in effect an Arrest Procedures policy manual and a Search and Seizure Execution policy manual. The Arrest Procedures policy manual has a section on "Safety Precautions" that states, "Protective sweeps of the premises or area where the arrest occurs shall be performed to ensure that no other persons or weapons are present that may represent a danger to the officers or the arrestee." Defs.' Ex. G, ECF No. 34-7, at 5. The Search and Seizure Execution policy manual defines a protective sweep as follows: "Quick and limited search of premises incident to an arrest or service of a warrant performed in order to identify weapons or other dangers to officers or others. Officers must be able to articular [sic] a reasonable basis for conducting a protective sweep. Officers may look in spaces immediately adjoining the place of arrest from which an attack could be launched." Defs.' Ex. H, ECF No. 34-8, at 1. Sullivan, Milatovic, and Euton all receive search and seizure training each year. On October 24, 2017, Sullivan, Milatovic, and Euton all attended a training course that included training on search and seizure law and protective sweeps, including material from *Maryland v. Buie*. In his deposition, Sullivan did not recall whether he had ever been specifically taught that in order to do a protective sweep, he must have articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene. Defs.' Ex. A. ECF No. 34-1, 2023 Sullivan Dep., 13:17-25.

Plaintiff has identified two prior complaints of unconstitutional misconduct against St. Charles County employees. The first involved the towing and impoundment of a motorist's vehicle, the motorist's twelve-hour detention following his arrest during a traffic stop, and

allegations that an officer had instigated and pursued false charges; the plaintiff later dismissed the claims against the officer. The second involved claims for failure to prevent harm, improper medical care, and wrongful death resulting from an inmate's death at the St. Charles County jail.

In Count I of her First Amended Complaint, Plaintiff asserts three claims under 42 U.S.C. § 1983 against officer Curtis Sullivan, in his individual and official capacities: (A) that he violated her Fourth Amendment rights when he placed his foot in the doorway to her apartment before officers conducted a protective sweep; (B) that he violated her Fourth Amendment rights when he detained Plaintiff at her apartment; and (C) that he violated Plaintiff's Fourth Amendment Rights by preparing a false probable cause affidavit.[4] In Count II, Plaintiff alleges that St. Charles County instituted and practiced policies, customs, and procedures that exhibited deliberate indifference to constitutional rights and that caused the violation of Plaintiff's rights.

## II.   LEGAL STANDARDS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Accord, e.g., Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023). The movant "bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.*

A dispute about a material fact is genuine, making summary judgment inappropriate, when

---

[4] This is how Defendants characterize the claims in Count I in their briefing. Plaintiff does not challenge this characterization, at it appears consistent with the Amended Complaint.

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

In a case brought under 42 U.S.C. § 1983 for violation of the Fourth Amendment, the plaintiff has the burden of proof. *Der v. Connolly*, 666 F.3d 1120, 1128 (8th Cir. 2012). However, where a presumption of unreasonableness arises from a warrantless search or entry, that presumption "impose[s] on the defendant the burden of going forward with evidence to meet or rebut the presumption." *Id.* (internal citations omitted). *See also Bradley v. Lincoln Police Dep't*, No. 4:20CV3134, 2021 WL 1873427, at *2 (D. Neb. May 10, 2021) (citing *Der* and stating, "The defendant has the burden of producing evidence that an exception to the warrant requirement applies."). Once a defendant has done so, "the ultimate risk of nonpersuasion" remains with the plaintiff. *Der*, 666 F.3d at 1128  (internal quotation marks omitted).

## III.   DISCUSSION

Defendants argue that Sullivan is entitled to qualified immunity on the individual-capacity claims against him because the undisputed facts show that he did not violate Plaintiff's clearly established constitutional rights. Defendants also argue that they are entitled to summary judgment on the official-capacity claims against Sullivan and the municipal liability claim against St. Charles County because Plaintiff cannot establish the elements of a municipal liability claim.

### A.  Individual-Capacity Claims Against Sullivan

For the individual-capacity claims against Sullivan, the Court must evaluate whether Sullivan is entitled to qualified immunity. In a § 1983 action, a government official is "entitled to

qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff[], demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Aldridge v. City of St. Louis*, 75 F. 4th 895, 898 (8th Cir. 2023) (quoting *Bell v. Neukirch*, 979 F.3d 594, 602 (8th Cir. 2020)). To be clearly established, "[t]he contours of the right must be sufficiently clear such that every 'reasonable official would have understood that what he is doing violates that right.'" *Jenkins v. Univ. of Minn.*, 838 F.3d 938, 944 (8th Cir. 2016)  (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In order for a right to be clearly established, there need not be "a case directly on point"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 at 741. "Failing to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment' is often fatal to a claim outside of obvious cases." *Moore-Jones v. Quick*, 909 F.3d 983, 985 (8th Cir. 2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

*1.  Count IA – The Warrantless Entry Into Plaintiff's Apartment*

The first issue in this case is whether Sullivan's placement of his foot in Plaintiff's apartment without a warrant, ostensibly for the purpose of initiating a protective sweep, was constitutionally permissible.[5] The Fourth Amendment holds inviolate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation

---

[5] After this initial entry, the full protective sweep of Plaintiff's apartment was actually conducted by Milatovic, who is not a defendant in this case.

marks omitted)). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573 (1980) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972) (internal quotation marks omitted)). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). "The Fourth Amendment generally prohibits police from entering a home without a warrant unless the circumstances fit an established exception to the warrant requirement." *United States v. Varner*, 481 F.3d 569, 571 (8th Cir. 2006) (quotation marks omitted).

The only exception to the warrant requirement that Defendants rely on to justify Sullivan's entry into Plaintiff's home is the limited exception for a "protective sweep" established in *Maryland v. Buie*, 494 U.S. 325 (1990). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. As relevant here, a protective sweep is permissible only "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337.[6] In establishing this exception, the Court in *Buie* reasoned that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf,'" and that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.* at 333. The

---

[6] The Supreme Court also established in *Buie* that "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. The parties appear to agree that that situation is not relevant here.

protective sweep must be "quick and limited" and "initially confined to places large enough to conceal a person." *United States v. Alatorre*, 863 F.3d 810, 815 (8th Cir. 2017). "*Buie* does not allow a protective sweep for weapons or contraband." *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005).

Defendants argue that the Eighth Circuit recognizes the validity of a protective sweep in two situations—"incident to arrest" (as was the situation in *Buie*) and "in the context of executing a search warrant." Defs.' Mem., ECF No. 33, at 3.[7] They appear to argue that Sullivan's protective sweep was incident to Jones's arrest, incident to Plaintiff's arrest, and/or incident to the search warrant Sullivan knew that other officers were applying for.

The Court first considers whether the protective sweep of Plaintiff's apartment could be considered "incident to" Jones's arrest, despite the fact that Jones was arrested in the parking lot and not in the apartment. Although Jones's arrest was not an "in-home" arrest like the arrest in *Buie*, the Eighth Circuit has held that *Buie* may permit a protective sweep of a home incident to arrest even where the arrestee was taken into custody outside a home. *See United States v. Thompson*, 6 F.4th 789, 791-93 (8th Cir. 2021) (upholding a protective sweep of home incident to arrest even though suspect had voluntarily come out of the house, been arrested outside the house, and been put in a police car; reasoning that there were facts sufficient to warrant a belief that there were individuals and weapons remaining in the house that could pose a danger to officers during or following the arrest); *Alatorre*, 863 F.3d at 814 (upholding a protective sweep of house incident

---

[7] In addition to the arrest warrant context and the search warrant execution context, the Eighth Circuit has also found that a protective sweep of a home may be permissible where the officers are already lawfully present inside the home by consent, *see United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014), as corrected (Feb. 11, 2014)), or based on exigent circumstances, *see United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1006 (8th Cir 2010). Defendants do not argue that either of those situations are present here.

– 10 –

to arrest even though the plaintiff was arrested on the porch; stating that "[p]rotective sweeps in these circumstances are justified because officers are vulnerable during an arrest or at a home, even when the arrestee and other occupants have been secured," that  "protection of officers conducting an arrest near a defendant's home is a priority recognized by our courts," and that "several articulable facts and rational inferences supporting the officers' reasonable beliefs that someone else could be inside posing a danger to them during or following the arrest."); *United States v. Davis*, 471 F.3d 938, 945 (8th Cir. 2006) (upholding a protective sweep of a barn 100 yards away from the house where an arrest for methamphetamine charges was simultaneously occurring; reasoning that "facts and inferences, especially when considered in the aggregate, would have led a reasonable officer to conclude that individuals posing a legitimate threat to his safety could be lurking in Davis's barn" where the arrestee had been observed making trips to and from the barn in the two hours before the arrest was occurring, there were multiple vehicles at the property, and the officers had prior intelligence suggesting that other persons could be inside the house and/or barn; stating, "While it is true that the barn did not immediately adjoin the area of arrest, the barn was not so far removed from the house that a reasonably prudent officer could dismiss the potential danger."). *See also United States v. Villanueva*, No. 5:17-CR-50049-JLV, 2019 WL 2931559, at *5 (D.S.D. Feb. 8, 2019) (upholding protective sweep as incident to arrest where "[t]he arrest took place directly outside the home, and the officers were vulnerable to potential attacks from someone inside the residence"), *report and recommendation adopted*, No. CR. 17-50049-02-JLV, 2019 WL 2285509 (D.S.D. May 29, 2019).

Here, Jones's arrest occurred at a traffic stop adjacent to Plaintiff's first-floor apartment, which opened to the outside. These facts are sufficient to show that, as in the above cases, officers on the arrest scene could reasonably have believed that *if* there were dangerous individuals harbored in Plaintiff's apartment, they could have posed a danger to officers on the arrest scene.

Thus, the Court finds that a search of Plaintiff's apartment could have been considered incident to Jones's arrest despite the fact that the arrest did not occur inside the home.

The Court next considers whether the search could be considered incident to Jones's arrest even though it occurred after Jones had been arrested before the sweep began. The Eighth Circuit has repeatedly found that a protective sweep may be considered incident to arrest even where, as here, the arrest has already occurred. *See Thompson*, 6 F.4th at 793 (upholding a protective sweep of home conducted after suspect had come out of the house, surrendered, and been put in a police car); *Alatorre*, 863 F.3d at 814 (upholding protective sweep of house conducted after the defendant had come out of the door and been handcuffed on the porch); *United States v. Williams*, 577 F.3d 878, 882 (8th Cir. 2009) ("Although Williams was handcuffed before the search occurred, a valid protective sweep may be conducted within a reasonable period of time after the subject of the warrant has been arrested."); *United States v. Boyd*, 180 F.3d 967, 975-76 (8th Cir. 1999) (upholding protective sweep of upstairs rooms of a house even after the arrestee had been handcuffed and taken downstairs; noting that "[o]fficers are permitted to take steps to ensure their safety both after, and while making the arrest" and that "[w]hile it is possible for a search incident to an arrest to be "undertaken too long after the arrest and too far from the arrestee's person . . . it does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures") (quotation marks omitted). *But see United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (finding facts showed no reasonable basis for belief that protective sweep was necessary to reduce harm to officers who "simply sat in their cars outside the warehouse" for 45 minutes after an arrest before entering a warehouse for a protective sweep).

Here, the record lacks specific facts addressing how much time passed between Jones's arrest the arrest and the protective sweep of Plaintiff's apartment. However, this does not appear to be a situation like that in *Chaves*, where officers were simply waiting and doing nothing for 45

minutes; instead, the facts suggest a continuous series of events, with officers actively participating in Jones's arrest and the follow-up to that arrest. Additionally, Plaintiff makes no argument that there was an unreasonable delay here. Based on the cases discussed above, including the Eighth Circuit's statement that "[o]fficers are permitted to take steps to ensure their safety both after, and while making the arrest," *Boyd*, 180 F.3d at 975-76, the Court certainly cannot say existing precedent would have made it clear to any reasonable officer that the sweep here occurred so long after the arrest that it could not be considered incident to that arrest. The timing alone thus does not provide a basis for denying Defendants' motion for summary judgment.

The Court next turns to the question of whether Sullivan had articulable facts and rational inferences supporting a reasonable belief that someone could be inside Plaintiff's apartment who posed a danger to officers on the arrest scene. Defendants argue that such suspicion is supported by the following facts: Sullivan knew there was at least one firearm in the apartment; Sullivan had been told that Plaintiff approached the scene of Jones's arrest and was irate and extremely agitated; Plaintiff became upset, angry, and took an aggressive stance with the officers when they asked for consent to search the apartment; Sullivan knew that Plaintiff and the two fourteen-year-olds were in the apartment; and Sullivan could not fully see into the apartment and did not know whether there could be additional dangerous individuals in the apartment.

Whether sufficient facts exist to support reasonable suspicion to support a protective sweep is a highly fact-specific inquiry. Facts tending to support reasonable suspicion include the likely presence of weapons in the home that could be used by individuals there, evidence of multiple people inside the home, evidence that there are individuals inside the home who have not made their presence known to officers (such as occupants calling out to unseen people in the home giving ambiguous or hesitant answers when asked if anyone is in the home), evidence that it would be easy to hide in the home just out of sight of the officers, and evidence that residents of the home

– 13 –

were involved in violent crime. *See, e.g., Thompson*, 6 F. 4th at 793 (upholding protective sweep of house where there were facts to suggest that the arrestee had left guns behind in the house that another person could use; the officers observed movement and possible preparation for an attack inside after they announced their presence; the house belonged to the arrestee's girlfriend, who had not been located; and an occupant asked whether anyone was in the house gave hesitant and ambiguous answers); *Alatorre*, 863 F.3d at 814-15 (upholding protective sweep where guns were conceivably present due to the arrestee's criminal history involving concealed weapons and a violent attack; audible movements and behaviors of people conversing in the house created uncertainty as to how many people were inside and their intentions toward the officers; and the arrestee's girlfriend lingered in the kitchen just out of sight of the officers until she was specifically called to the door, indicating that it would be easy for someone to hide just out of view of the officers in a position from which an attack could be launched); *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) (upholding protective sweep where agents had been informed that a suspect in the home was involved in drugs and may have purchased a gun, other occupants were hesitant when asked if others were present, and one occupant turned his head toward the hallway in response to being asked whether anyone else was in the apartment); *United States v. Williams*, 577 F.3d 878, 881 (8th Cir. 2009) (upholding protective sweep of a home based on the suspect's opportunity to alert a possible accomplice, his past conviction for unlawful possession of a firearm, and the fact that a child had yelled out for "Mom and Dad," creating the inference that there might be more adults inside the home, unseen by officers).

On the other hand, the mere *lack* of information, and resultant uncertainty about who might be inside a home or structure, cannot justify a protective sweep. *See Chaves*, 169 F.3d at 692 (11th Cir. 1999) (protective sweep of warehouse following arrest impermissible where testimony "indicates that the officers had no information regarding the inside of the warehouse"; stating, "the

officers' lack of information cannot justify the warrantless sweep in this case); *United States v. Reid*, 226 F.3d 1020, 1027-28 (9th Cir. 2000) (protective sweep not permissible where the only facts to suggest the presence of a second person in the apartment were the aroma of burning marijuana and the presence of a Lexus in the parking lot because "one person can smoke marijuana alone" and "there was no evidence that other persons were inside the apartment"); *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996) ("Lack of information cannot provide an articulable basis upon which to justify a protective sweep."); *United States v. Calhoun*, 49 F.3d 231, 233 & 234 n.3 (6th Cir. 1995) (prearranged protective sweep following arrest impermissible where there was "no prior knowledge anyone was inside" and "no basis on which the officers could fear danger to themselves or the destruction of any potential evidence").

Additionally, the presence of an arrestee's family members inside the home, without some other facts to suggest that they pose a danger to officers, cannot support a finding of reasonable suspicion. *See United States v. Hatcher*, 441 F. Supp. 3d 723, 740-41 (N.D. Iowa 2020) (protective sweep not permissible where the defendant's girlfriend told officers the only persons in the home were her, her son who was playing a video game, and her uncle who was sleeping; no witness claimed to see anyone else in the car with the defendant or exit the car and go into the house with defendant; and the girlfriend allowed the officers to follow her upstairs to search the one room defendant entered when he came into the home alone); *United States v. Finley*, 155 F. Supp. 3d 962, 971 (D. Neb. 2015) (protective sweep not permissible where "the people remaining in the house were women and children" and an audio recording "demonstrate[d] that the officers were not in immediate danger and could have secured the premises from the outside while waiting for a warrant").

The facts of this case present a close call. Here, there was no evidence of unseen or unknown individuals in the home: Plaintiff and the two fourteen-year-old girls were inside the

home but had made themselves known to the officers, no one gave hesitant or ambiguous answers to officer questions regarding the occupants of the apartment, and the officers admitted that they had no articulable facts to support a belief that anyone was in the apartment aside from Plaintiff and the two fourteen-year-old girls. Additionally, there was no evidence that Plaintiff or the fourteen-year-old girls had a history of violence or criminal activity. On the other hand, this is not a situation where officers had no information at all, nor is it a situation where the officers' only information was that there were family members in the apartment. Here, the officers had information that one of the family members had been irate and agitated with officers at the traffic stop scene; that she was angry, upset, and took an aggressive stance with the officers when they asked to search her apartment; and that there was a firearm in the apartment with her.

The Court is skeptical that a family member being angry at officers about an arrest and/or potential search, even where there is a firearm in the home, is sufficient to support a finding of reasonable suspicion that the family member or someone else inside poses a danger to officers at the arrest scene, especially in the absence of any facts to suggest the family member was involved in violent or criminal activity. However, the Court need not decide whether these facts support a finding of reasonable suspicion. Even assuming, *arguendo*, that Sullivan did not have sufficient articulable facts to justify a protective sweep incident to arrest, Sullivan is entitled to qualified immunity because the Court cannot say that existing precedent placed the question beyond debate. As discussed above, the cases relied on by Plaintiff and identified by the Court where a constitutional violation was found involved facts less suggestive of reasonable suspicion than those present here; they certainly did not involve both an angry person and a firearm. Plaintiff has not identified, and the Court has not found, any cases involving circumstances similar to those here. *See Moore-Jones*, 909 F.3d at 985 ("The failure to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment is often fatal to a claim

– 16 –

outside of obvious cases.") (internal quotation marks omitted). Based on the existing case law, the Court cannot say that any reasonable officer would have understood that conducting a protective sweep under the circumstances presented here violated Plaintiff's constitutional rights.

For all of the above reasons, the Court finds that Defendants are entitled to summary judgment based on qualified immunity on Count IA (the warrantless entry into Plaintiff's apartment). [8] The Court need not address in detail Defendants' other, weaker, proposed justifications for the entry into Plaintiff's apartment.[9]

_____

[8] Plaintiff also argues in her response that even if the protective sweep was permissible, it did not justify her remaining handcuffed within the premises for hours as the officers waited for the search warrant. She does not cite cases related to this argument, and it is unclear whether she is objecting to the officers' continued presence in the apartment, to her detention in handcuffs, or to both. To the extent that she is objecting to her detention in handcuffs, that claim is addressed as Count IB below. To the extent that she is objecting to the officers' having remained in her apartment, after the protective sweep, while awaiting the search warrant, she has not directed the Court to any authority to suggest that doing so would have constituted a clearly established violation of Plaintiff's Fourth Amendment rights, nor has the Court found any such authority. The Court's research suggests that a reasonable officer could have believed that once inside, it was permissible to secure the premises from within while waiting for the search warrant. *See Segura v. United States*, 468 U.S. 796, 811 (1984) (finding that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents" and finding that although the "wiser course would have been to depart immediately and secure the premises from the outside by a 'stakeout' once the security check revealed that no one other than those taken into custody were in the apartment . . . Securing of the premises from within . . . was no more an interference with the petitioners' possessory interests in the contents of the apartment than a perimeter 'stakeout'").

[9] Defendants' suggestion that Sullivan's entry was a protective sweep incident to Plaintiff's own arrest is without merit because the protective sweep began *before* the alleged crime that formed the basis for Plaintiff's arrest—Plaintiff's alleged assault of Sullivan—had even occurred. Defendant could not have initiated the sweep to protect vulnerable officers on the scene of Plaintiff's arrest, because at the time, there was no scene of Plaintiff's arrest and no arrest of Plaintiff was anticipated. *Cf. United States v. Sanders*, 4 F.4th 672, 677 (8th Cir. 2021) ("When examining whether the officers had a reasonable basis to enter [a] home without a warrant, [the court] look[s] to the facts known to the officers at the time they made the decision to enter.").

Defendants' suggestion that Sullivan's entry was a permissible protective sweep incident to the execution of a search warrant is also without merit because no search warrant was in existence at the time of the protective sweep. Outside the arrest context, the Eighth Circuit has found a protective sweep based on officer safety concerns permissible where officers already have a search warrant and are executing it, *United States v. Green*, 9 F.4th 682, 692 (8th Cir. 2021),

– 17 –

2.   *Count IB: The Detention of Plaintiff at Her Apartment*

Plaintiff's second claim is that Sullivan illegally detained and/or arrested Plaintiff at her apartment without legal cause or justification. "To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003) (quoting *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999)). It is undisputed that a seizure occurred here. "Reasonableness of a seizure is determined by the totality of the circumstances and must be judged from the viewpoint of a reasonable officer on the scene, irrespective of the officer's underlying intent or motivation." *Id.* at 848.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Brown v. City of St. Louis, Missouri*, 40 F.4th 895, 900 (8th Cir. 2022) (quoting *Bell v. Neukirch*, 979 F.3d

---

where officers are already inside the home based on consent, *see United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014), as corrected (Feb. 11, 2014), or where officers are already inside the home based on exigent circumstances, *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1006 (8th Cir. 2010). However, the Court has found no cases in the Eighth Circuit or elsewhere suggesting that, outside the arrest context, officers who do not already have another lawful basis to be inside a home may *enter* a home to conduct a protective sweep based on officer safety concerns. The authority the Court has found is to the contrary. *See United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) ("*Upon legally entering a residence*, officers have the authority to conduct a protective sweep of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous.") (emphasis added); *United States v. Wyatt*, No. 1:10-CR-42, 2012 WL 1071946, at *10 (W.D. Ky. Mar. 28, 2012) ("[P]rotective sweeps not made incident to an arrest may only be conducted when the police officers have gained lawful entry onto the premises.").

The Court also notes that Defendants do not argue that Sullivan's entry was a permissible protective sweep under *United States v. Jansen*, which permits officers "to conduct a protective sweep search pending an application for a search warrant when there is a risk that evidence will be destroyed." 470 F.3d 762, 765 (8th Cir. 2006). Defendants do not cite *Jansen* or related cases and do not argue that there was a risk that Plaintiff would destroy the shotguns sought by the search warrant, nor would a belief that Plaintiff might destroy the shotguns have been reasonable in light of the fact that (unlike the drugs that were present in *Jansen*) a shotgun is not the type of evidence that can be easily destroyed and the of the fact that Plaintiff had freely admitted to Sullivan that the weapons were inside the apartment.

– 18 –

594, 603 (8th Cir. 2020)). "Probable cause exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Id.* (quoting *Nader v. City of Papillion*, 917 F.3d 1055, 1058 (8th Cir. 2019)) (quotation marks omitted). "To determine whether an officer had probable cause for an arrest, [the court] examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (quotation marks omitted).

"[E]ven if an officer arrests an individual without *actual* probable cause—in violation of the Constitution—he has not violated that individual's 'clearly established' rights for qualified immunity purposes if he nevertheless had *arguable* probable cause to make the arrest." *Id.* at 901 (quotation marks omitted). Arguable probable cause exists where the officer "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *Id.* (quotation marks omitted). The arguable probable cause inquiry is part of the second prong of the qualified immunity analysis. *Id.*

The Court first considers Defendants' argument that Plaintiff's detention was constitutional because Sullivan arrested Plaintiff for assaulting Sullivan and for resisting arrest, both of which are proper bases for an arrest under Missouri law. Sullivan's testimony that Plaintiff pushed him, if accepted by the jury, would establish probable cause (or at least arguable probable cause) for Plaintiff's arrest for assault. However, Plaintiff disputes that she pushed Sullivan, citing her own deposition testimony suggesting that her hands were on the door and door frame (not pushing Sullivan), when he grabbed her to arrest her. Although Plaintiff's testimony is not very clear, the Court finds it sufficient to create a genuine issue of material fact regarding whether Plaintiff pushed Sullivan. Because there is a genuine issue of material fact regarding whether Sullivan had probable cause for an arrest for assault, Sullivan is not entitled to summary judgment on Plaintiff's detention claim on this basis.

– 19 –

Defendants argue, in the alternative, that Sullivan was permitted to detain Plaintiff while officers applied for and obtained a search warrant for her apartment. Defendants rely on *Illinois v. McArthur*, 531 U.S. 326 (2001), in which the Supreme Court addressed the constitutionality of an officers' decision to prevent an individual from entering his residence while officers sought a search warrant for his residence.[10] In *McArthur*, police officers had probable cause to believe that McArthur had hidden marijuana in his trailer home. *Id.* at 328-29. They knocked on the trailer door and asked for consent to search, which he denied. *Id.* at 329. Some officers then went to obtain a search warrant. *Id.* At that point, McArthur was on the porch. *Id.* Officers told him he could not reenter the trailer unless a police officer accompanied him. *Id.* The Court found the warrantless seizure of the premises was not *per se* unreasonable, stating, "[It]involves a plausible claim of specially pressing or urgent law enforcement need, i.e., 'exigent circumstances,'" and "the restraint at issue was tailored to that need, being limited in time and scope, and avoiding significant intrusion into the home itself." *Id.* at 330 (internal citations omitted). The Court then "balance[d] the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id.* at 331. The Supreme Court found that the warrantless seizure of the premises was reasonable in light of four circumstances. First, the police had probable cause to believe that the trailer home contained evidence of a crime and unlawful drugs. *Id.* at 331-32. Second, "the police had good reason to fear that, unless restrained, [the suspect] would destroy the drugs before

---

[10] Defendants also cite several cases in which officers detained individuals during the execution of an already-issued search warrant. *See Bailey v. U.S.*, 568 U.S. 186, 201 (2013); *Muehler v. Mena*, 544 U.S. 93 (2005); *Michigan v. Summers*, 452 U.S. 692 (1981). Those cases are of little relevance to the case at bar, in which the officers had not yet obtained a search warrant at the time they detained Plaintiff. *See Summers*, 452 U.S. at 701 ("Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there.").

they could return with a warrant." *Id. a*t 332. Third, "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy" by imposing a restraint significantly less restrictive than arresting McArthur—they only prevented him from entering the trailer unaccompanied. *Id.* Fourth, the restraint was imposed for a limited period of time, two hours. *Id. See also Brunson v. Bigbee*, No. 5:19-CV-001110TBR, 2021 WL 4037842, *7 (W.D. Ky. Sept. 3, 2021) (relying on *McArthur* to find two-hour detention of suspect in handcuffs pending application for search warrant was reasonable where the officers had probable cause to believe the plaintiff had evidence of illegal drugs inside the residence; it was reasonable to believe that he would hide or destroy the evidence if he were allowed back in; and the officers used handcuffs because when he was initially detained without handcuffs, he fled from detention, ran inside the home, and locked the doors).

The Court finds *McArthur* and *Brunson* both distinguishable from the instant case. In both cases, there was an exigency present: that it was reasonable to believe that unless restrained, the suspect would destroy the evidence being sought (drugs) before the officers could return with a warrant. The instant case involves no such exigency. The officers were anticipating a search warrant to look for firearms, not drugs or any other evidence that could be easily destroyed. There is nothing to suggest that a reasonable officer could have believed that, had Plaintiff not been restrained, she could have destroyed any firearms in the apartment. Additionally, unlike the officers in *McArthur* and *Brunson*, the officers here also did not make any attempt to reconcile "their law enforcement needs with the demands of personal privacy" by restraining Plaintiff in a less restrictive manner—for example, by preventing her from entering the apartment; instead, Sullivan simply immediately placed her in handcuffs. The Court finds that Sullivan violated Plaintiff's Fourth Amendment rights when he detained her in handcuffs while waiting for the search warrant.

However, moving on to the second prong of the qualified immunity analysis, the Court cannot say "existing precedent . . . placed the statutory or constitutional question beyond debate." *See al-Kidd*, 563 U.S. at 741. Plaintiff does not cite, and the Court has not identified, any cases presenting facts similar to those here in which a court has found a Fourth Amendment violation. Indeed, Plaintiff provides no argument whatsoever in response to Defendants' argument that the anticipated search warrant justified Plaintiff's detention. Another court recently granted qualified immunity to an officer under similar circumstances, suggesting that the right was not clearly established at the time of the events of this case in 2018. *See Hampton v. Nevada*, No. 220CV00578APGDJA, 2022 WL 14717150, at *3-*4 (D. Nev. Oct. 24, 2022) (holding that an officer who detained an individual in handcuffs for over an hour while officers obtained a search warrant for weapons and epithelial cells was entitled to qualified immunity because the plaintiff had not identified any case with sufficiently comparable facts sufficient to put the question of the detention's constitutionality beyond debate). *See also Whalen v. Langfellow*, 731 F. Supp. 2d 868, 883 (D. Minn. 2010) (granting summary judgment based on qualified immunity on a plaintiff's claim that he was illegally detained inside his residence while an application for a search warrant was pending; relying on cases finding it was reasonable to secure a dwelling pending execution of a search warrant to prevent destruction or removal of evidence).

Under these circumstances, the Court finds that Sullivan is entitled to summary judgment based on qualified immunity on Count IB, the detention of Plaintiff at her apartment.

3.  *Count IC: Pretrial Detention Based on False Statements in Probable Cause*
    *Affidavit*

Plaintiff's third claim is that Sullivan prepared an affidavit falsely stating that Plaintiff

"assaulted" him and "resisted arrest" under such circumstances as he knew or should have known

that the State would reasonably rely on the truthfulness of the affidavit to commence criminal

proceedings against Plaintiff. These statements led a judge to issue an arrest warrant and led to

Plaintiff's eventual arrest.

In *Manuel v. City of Joliet, Ill.*, the Supreme Court explained:

> [P]retrial detention can violate the Fourth Amendment not only when it precedes,
> but also when it follows, the start of legal process in a criminal case. The Fourth
> Amendment prohibits government officials from detaining a person in the absence
> of probable cause. That can happen when the police hold someone without any
> reason before the formal onset of a criminal proceeding. But it also can occur when
> legal process itself goes wrong—when, for example, a judge's probable-cause
> determination is predicated solely on a police officer's false statements. Then, too,
> a person is confined without constitutionally adequate justification. Legal process
> has gone forward, but it has done nothing to satisfy the Fourth Amendment's
> probable-cause requirement.

580 U.S. 357, 366-67 (2017).

Defendant argues that even if Plaintiff disputes the veracity of the statements in the

affidavit related to Plaintiff's assault and resisting of arrest, her claim fails because the judge's

probable cause determination was not based solely on the allegedly false statements, but was also

based on additional statements, not controverted by Plaintiff, that show probable cause that she

committed other crimes. Specifically, in addition to stating that Plaintiff pushed Sullivan and

resisted arrest, the probable cause statement also stated that officers discovered firearms and a

marijuana grinder in Plaintiff's bedroom, that Plaintiff had advised Sullivan that she knew Jones

had multiple firearms he could not legally possess, and that Jones had brought the firearms into

her apartment with permission. Defs.' Ex. F, 34-6, at 4. Based on all of those statements, the

prosecuting attorney charged Plaintiff with four charges (assault, resisting or interfering with

arrest, conspiracy to commit unlawful possession of a firearm, and unlawful possession of drug paraphernalia), and a judge found probable cause and issued an arrest warrant for all four charges. Defendants argue that because the judge's probable cause determination was not "predicated solely" on the allegedly false statements in the affidavit, but was also based on undisputed statements showing probable cause for other crimes, Plaintiff's pretrial detention claim fails.

Plaintiff does not provide any response to this argument in her brief. Defendants argue that she has waived this claim, and the Court agrees. "The 'failure to oppose a basis for summary judgment constitutes waiver of that argument,' because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment." *Paskert v. Kemna-ASA Auto Plaza, Inc.,* 950 F.3d 535, 540 (8th Cir. 2020) (quoting *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009)). It is "not the District Court's responsibility to sift through the record to see if, perhaps, there [i]s an issue of fact." *Id.*

The Court also agrees with Defendants that the record does not contain any evidence from which a reasonable juror could find in Plaintiff's favor on this claim. In her response to Defendants' Statement of Undisputed Material Facts' description of the probable cause statement, Plaintiff states generally that "All of this is false and is known by counsel to have been denied pursuant to her plea of Not Guilty," and she notes that the charges were ultimately dismissed pursuant to her plea agreement. *See* Pl.'s Resp. to Defs.' SUMF, ECF No. 35-1, ¶ 40. However, although she cites evidence supporting her contention that Sullivan's statements regarding the *assault and resisting arrest charges* were false, she does not actually cite any evidence that Sullivan's statements in the probable cause statement related to firearms or drug paraphernalia were false. She even specifically admits that during execution of the search warrant, police found multiple firearms and drug paraphernalia in her apartment. *Id.* ¶ 37. Thus, Plaintiff cannot establish

– 24 –

that any detention based on the probable cause statement occurred without probable cause, and her Fourth Amendment claim fails. *See, e.g., Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019) ("[P]robable cause is an absolute defense to claims under section 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention. And because probable cause is an objective standard, Norris's arrest was lawful if Officer Serrato had probable cause to arrest him for *any offense*, regardless of the reason the police were called or the reason given for the arrest.") (internal citations omitted).

For the reasons stated above, and in the absence of any contrary argument from Plaintiff, the Court finds that Sullivan is entitled to summary judgment on Count IC, the claim that she was improperly detained based on false statements in a probable cause affidavit.

### B.  Municipal Liability Claims Against Defendant St. Charles County

In Count II of the Amended Complaint, Plaintiff alleges that Defendant St. Charles County "instituted and practiced policies, customs and procedures which exhibited deliberate indifference to the Constitutional rights of persons . . . . in that [it] failed to adequately teach and train its officers as to when warrantless searches may be conducted and, specifically, under what circumstances a lawful 'security sweep' may be conducted . . . ." Am. Compl. ¶ 34. She also alleges that "it was the policy, custom and practice of St. Charles County to inadequately hire, train, and supervise its officers." *Id.* ¶ 35. She further alleges that St. Charles County is "vicariously liable" for the actions of Sullivan. *Id.* ¶ 37.

Defendants argue that St. Charles County is entitled to summary judgment on Count II because vicarious liability does not exist in § 1983 actions and because Plaintiff has no evidence to support a finding in her favor on a municipal liability claim.

The Court agrees with Defendants that St. Charles County cannot be held liable for Sullivan's actions based on a vicarious liability theory. It is well-established that a government

– 25 –

entity cannot be held vicariously liable under 42 U.S.C. § 1983 for the actions of its employees. *See, e.g., Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[U]nder § 1983, local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions.") (citations and quotation marks omitted); *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012) ("It is well-established . . . that a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

Defendant next argues that there is no genuine issue of material fact and that St. Charles County is entitled to summary judgment on Plaintiff's municipal liability claims. A constitutional violation may give rise to municipal liability if the constitutional violation "resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1089 (8th Cir. 2018) (internal quotation marks omitted). In her response, Plaintiff describes her claim solely as one for failure to train. Because Plaintiff addresses only a failure to train claim and makes no arguments regarding any other type of municipal liability claim, the Court finds that she is pursuing only a failure to train claim and has waived any other municipal liability claims.

To establish a § 1983 claim for failure to train, Plaintiff must show (1) that St. Charles County's officer-training practices were inadequate; (2) that St. Charles County was deliberately indifferent to the rights of others in adopting these training practices, and its failure to train was a result of deliberate and conscious choices it made; and (3) that St. Charles County's training deficiencies caused Plaintiff's constitutional deprivation. *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th Cir. 2013) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996)).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). This is because "[p]olicymakers' continued

adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* (quotation marks omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* However, "[t]he Supreme Court has not foreclosed the possibility that a single violation of constitutional rights could trigger municipal liability, where the violation is accompanied by a showing that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

Defendants argue that Plaintiff has no evidence to establish the elements of a failure to train claim, in particular the deliberate indifference element. They point to evidence that St. Charles County does train its officers on *Maryland v. Buie* and protective sweeps, and they point out that Plaintiff has not shown a pattern of similar instances of misconduct that might have placed the County on notice that its training was inadequate and thus demonstrated that it was deliberately indifferent.

In her response, Plaintiff does cite any cases addressing the standard for establishing a municipal liability claim and does not specifically respond to Defendants' argument that there is no evidence to show deliberate indifference on the part of St. Charles County. Indeed, she does not acknowledge the deliberate indifference standard at all. She argues that her failure to train claim is supported by the following evidence. First, she argues that the officers' inability to articulate facts supporting a suspicion that anyone other than Plaintiff and the fourteen-year-old girls were present at the apartment shows that they misunderstood the applicable law. Second, she

argues that the Search and Seizure Execution policy manual's description of a "protective sweep" is inadequate. It states, in relevant part,

> 4. PROTECTIVE SWEEP. Quick and limited search of premises incident to an arrest or service of a warrant performed in order to identify weapons or other dangers to officers or others. Officers must be able to articular (sic) a reasonable basis for conducting a protective sweep. Officers may look in spaces immediately adjoining the place of arrest from which an attack could be launched.

Def. Ex. H, ECF No. 34-8, at 1. She argues that this language is deficient because does not specifically state that there must be articulable facts suggesting the presence of another individual who posed a danger to the officers and because it incorrectly indicates that *Buie* allows a protective sweep for weapons. Third, Plaintiff argues that a comparison of the detail in the manual's section on *Brady* material with the lack of detail in the manual's sections on protective sweeps shows how deficient the protective sweep section is. Fourth, Plaintiff argues that the fact that the policy manual has remained unchanged for years preceding this incident illustrates the County's negligence or omissions. Fifth, Plaintiff argues that the fact that all three officers deposed were under the mistaken understanding that entry into a private home to "secure weapons" prior to production of a search warrant shows that the training was woefully deficient.

Although the Court agrees with Plaintiff that some of the language in the Search and Seizure Execution policy manual (and the Arrest Procedures manual also produced by Defendants) appears problematic,[11] none of the above comes close to establishing that St. Charles County was

---

[11] In particular, the Court agrees that the definition of "protective sweep" in the Search and Seizure Execution policy manual appears to indicate that a *Buie* sweep may be performed to find weapons, whereas the Eighth Circuit has found that "*Buie* does not allow a protective sweep for weapons or contraband." *See Waldner*, 425 F.3d at 517. The Arrest Procedures policy manual contains similar language suggesting that protective sweeps may be done to look for weapons, stating, "Protective sweeps of the premises or area where the arrest occurs shall be performed to ensure that no other persons or weapons are present that may represent a danger to the officers or the arrestee" Def.'s Ex. G, ECF No. 34-7, at 5. Additionally, the language in the Arrest Procedures policy manual, standing alone, could leave officers with the impression that protective sweeps incident to arrest

deliberately indifferent to the rights of persons in its training procedures related to protective sweeps. First, as Defendants point out, these manuals do not represent the only training on the subject that St. Charles provided to its officers; Sullivan, Milatovic, and Euton all received additional training on searches and seizures, including attending a training course in October 2017 that included training on searches and seizures and that specifically included training on protective sweeps, including specific language from *Maryland v. Buie* and related cases indicating that officers conducting a protective sweep must have specific and articulable facts to support a reasonable belief that the officers or others are in danger and that the protective sweep must only include areas where a person could be hiding. *See* Def. Ex. M, ECF No. 34-13, at 25. Second, Plaintiff makes no attempt to show that St. Charles County had "notice that [its] course of training was deficient," as required to show deliberate indifference. *See Connick*, 563 U.S. at 62. Plaintiff cites no evidence of prior, similar constitutional violations by St. Charles County employees, which is ordinarily required. The only two prior complaints Plaintiff identified against St. Charles County involved issues unrelated to protective sweeps. Moreover, given that officers *were* trained on *Buie* and protective sweep law, Plaintiff cannot establish that this is the unusual case where a pattern of violations is not required because Plaintiff has made a showing that St. Charles County "failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *See Szabla*, 486 F.3d at 393. At most, Plaintiff has cited evidence from which a reasonable juror could find that St. Charles County could have provided better and/or more comprehensive training on protective sweeps and that the officers involved in this case did not have the best understanding or recall of the limits of the protective sweep doctrine. She has not cited evidence sufficient to support a finding that St. Charles County was deliberately indifferent,

---

(beyond the area immediately adjoining the arrest) are to be conducted as a matter of course, rather than only when articulable facts supporting reasonable suspicion are present.

as is required for a municipal liability claim.

For all of the above reasons, the Court finds that St. Charles County is entitled to summary judgment on Count II, the municipal liability claim.

### C. Official-Capacity Claims Against Defendant Sullivan

Finally, to the extent that Plaintiff asserts claims against Sullivan in his official capacity as an officer of St. Charles County, Sullivan is entitled to summary judgment for the same reasons as St. Charles County is entitled to summary judgment. The Eighth Circuit has held that "[a] suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007). Accordingly, the Eighth Circuit has held that it proper for a district court to dismiss a claim against an officer in his official capacity "as redundant of the claim against the City." *Id. See also, e.g.*, *Taylor v. St. Louis Cmty. Coll.*, No. 4:18CV00272 SNLJ, 2018 WL 5078360, at *6 (E.D. Mo. Oct. 18, 2018) ("Because plaintiff has asserted this claim against defendant Gee in his official capacity and also against [St. Louis Community College], the court finds the claim redundant and must be dismissed.").

Because Plaintiff's claims against Sullivan in his official capacity are functionally claims against St. Charles County, and because St. Charles County is entitled to summary judgment on the claims against it, the Court also grants summary judgment in favor of Sullivan on the official-capacity claims against him.

### IV.   CONCLUSION

For all of the above reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 32) is **GRANTED**. A separate judgment shall accompany this Memorandum and Order.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of April, 2024.